JAMES CERRUTI, JR., ET AL.
*vs.*
ALFRED E. BURDICK

Superior Court    Middlesex County    File No. 8311

MEMORANDUM FILED JULY 14, 1942.

*Forward & Levin,* of Hartford, for the Plaintiffs.

*F. Howard Stickney* and *L. Horatio Bigelow,* of Deep River, for the Defendant.

Memorandum of decision in action involving breach of lease and wrongful eviction.

INGLIS, J.   On March 16, 1938, title to property fronting on Route 9 for about 300 feet and lying between the property of the New York, New Haven & Hartford Railroad Company on the west and Mud River on the east and located in Essex, Connecticut, stood in the name of Louis Pieretti and Joseph Pieretti, partners under the name of Pieretti Brothers, subject to mortgage to The Central National Bank of Middletown, Connecticut.   Louis Pieretti had disappeared and the bank was threatening to foreclose.   On that day, Joseph Pieretti executed a quitclaim deed purporting to convey all the interest of the partnership to the defendant, Alfred E. Burdick.   On March 11, 1938, The Middletown Trust Company, apparently acting for The Central National Bank, had agreed in writing to convey the property to Burdick, when the foreclosure should be completed, for $1,500, of which Burdick had paid $500, and had further agreed that Burdick should "have the use of the land."   Accordingly, although Burdick did not finally get his deed from The Central National Bank until May 10, 1940, from March 16, 1938, on he was the virtual owner of the property or at least so regarded himself.

On the property was a gravel bank and during the summer of 1938 Burdick removed a considerable amount of sand there-from so that by the fall the front of the property was fairly level with the road in front.

In the fall of 1938 the plaintiff, Doris Cerruti and her husband (who was employed by Burdick) approached the defendant with the proposition that he lease them the land or a portion of it for the erection thereon of a diner.   The defendant, who for some years had taken a fatherly interest in the plaintiff and her husband, welcomed that proposition and it was orally agreed between the plaintiff and the defendant that the defendant would lease to the plaintiff a piece of the land 200 feet in front and 70 feet in depth for the term of ten years for the yearly rent of $50.   The defendant and the

plaintiff fixed the location of the land leased by driving a stake on the land and agreeing that that stake should mark the center of the front of the diner to be erected and that the frontage of the land should extend 100 feet in each direction along the road from that stake.

Relying on the verbal lease, the plaintiff purchased an old house boat for $50 and after grading the land moved the deck-house of that boat onto the land. The total cost of grading, moving the building and setting it on the land and making water connections was $147.80. All of this expense was incurred with the knowledge and indeed with the assistance of the defendant and he was therefore estopped to deny the existence of the verbal lease. *Wolfe vs. Wallingford Bank & Trust Co.*, 122 Conn. 507.

In order to meet the expense of moving the building and of erecting an addition thereto which was planned and later done at a cost of $400 on October 31, 1938, the plaintiff and her husband applied through The Essex Lumber Co. to Allied Building Credits, Inc., for a loan of $574.90, stating in the application that the plaintiff had a ten year lease. Before granting the loan, Allied Building Credits, Inc., requested a copy of the lease. The plaintiff and defendant then had a written lease prepared which lease they both executed. This lease followed the terms of the oral agreement, incorporated the usual covenants including the covenant for quiet enjoyment and evidenced that the defendant leased to the plaintiff a piece of his land 200 feet in front and 70 feet in depth for the term of ten years from November 5, 1938, for the yearly rent of $50. Only one copy of this lease was executed. Without having the lease recorded, it was forwarded to Allied Building Credits, Inc.

After some further negotiations, Allied Building Credits, Inc., agreed to extend the credit requested and on December 14, 1938, the plaintiff and her husband and the defendant all signed a note for $574.90 made payable to the defendant in installments of $15 on February 1, 1939, and $15.97 on the first of each month thereafter, until paid in full. This note was endorsed to Allied Building Credits, Inc., without recourse by the defendant and by The Essex Lumber Company.

On December 15, 1938, The Allied Building Credits, Inc., returned the lease to The Essex Lumber Company which in

turn handed it to Mrs. Cerruti. She delivered it to the defendant on his agreement to have it recorded. He never did record it but at some later time burned it.

On February 17, 1939, the defendant entered into a written agreement with United Advertising Corporation whereby he granted to that corporation the privilege of erecting and maintaining on his land, a portion of which he had leased to the plaintiff, a sign 75 feet in length and 15 feet high for the term of one year from June 1, 1939, with the privilege of renewal for five years. About June 1, 1939, such a signboard was erected. The western end of this signboard was about 25 feet east of the plaintiff's diner. From there it extended at a slight angle to the line of the road for 25 feet and then easterly practically parallel to the line of the road for 50 feet. The front of the diner was about 45 feet from the edge of the road and the face of the sign at the angle in it was about 30 feet back from the road. Accordingly, the view of the diner was obstructed by the sign to the extent that travelers on the road proceeding in a westerly direction would not see the diner until they got to within 200 feet of it.

As soon as it became apparent that the sign would somewhat obstruct the view of the diner the plaintiff protested. Before that, the plaintiff's husband had left the employ of the defendant and the defendant no longer felt the fatherly feeling toward the plaintiff and her husband which he formerly had had. When the plaintiff protested, the defendant told her that the sign would stay where it was.

The plaintiff paid the first year's rent of $50 in small installments during the year of 1939.

In the fall of 1939, the defendant made some tentative plans to sell property owned by C. P. Burdick & Son located a short distance west of the property in question and then to move onto the property where the diner was the oil tanks, coal pockets and office of his own business. He also had some negotiations with the Community Auto Sales Company looking to the sale of the property in question to that company. While these plans and negotiations were in progress, to wit, on December 4, 1939, the defendant wrote the plaintiff that "your year's lease on diner was up November 5th....In future rent will be $15.00 per month and only by the month." By that time the defendant had concluded that the value of the

property was such that $50 a year was an inadequate rental and also he desired to have the property free for another use.

Upon receipt of the letter the plaintiff ascertained for the first time that her lease had not been recorded. She interviewed the defendant who told her that the written lease had been lost and without that she would be unable to prove that she had any lease on the property. He also insisted that the lease had been for only one year and told her that if she did not like his way of doing business she could move off.

About January 1, 1940, the defendant purchased the note which had been given by the parties to Allied Building Credits, Inc. His motive in doing so was in part so that he might get control of the application for the loan which recited the existence of the lease and in part to be able to hold the note over the plaintiff's head. However, Allied Building Credits, Inc., did not surrender the application and the plaintiff was able to meet the installments of the note as they became due.

The plaintiff, believing that without a written lease she was helpless, started in to pay $15 per month and continued that until the following March. She then found another location on the opposite side of Route 9 about 1,000 feet to the west and moved her diner to that location. Her only reason for moving was that she anticipated because of the defendant's conduct that he intended to evict her. She believed his representation that she could not successfully resist eviction and it appeared to her wise to obtain a new location when she could. The total cost to which she was put of preparing the new site and moving and placing her diner thereon was $499.77.

Upon the foregoing facts it is apparent that there was a valid and enforcible lease between the parties whereby the defendant leased the land in question to the plaintiff for a term of ten years from November 5, 1938, at the annual rental of $50. The oral lease entered into in October, 1938, would have been enforcible in spite of the Statute of Frauds because the defendant was estopped to deny its existence, but aside from that the lease was reduced to writing in the written lease of November 5th and although that which induced the making of the written lease was the request of Allied Building Credits, Inc., to see the lease, it is nevertheless clear that both parties then intended that the written lease should evidence the lease which they had entered into orally.

In order to constitute a constructive eviction there must be such a disturbance of the tenant's possession by the landlord that the premises are thereby rendered unfit or unsuitable for occupancy for the purposes for which they were leased and the tenant must elect to treat it as an eviction and surrender possession. *Amsterdam Realty Co. vs. Johnson,* 115 Conn. 243, 245. The erection of the signboard partly on the land leased to the plaintiff did not render the premises unfit for occupancy nor did it so far obstruct the view of the diner that it rendered the premises unsuitable as a site for a diner. Moreover, the plaintiff did not elect to treat it as an eviction because she continued to occupy the premises for nearly a year thereafter. Accordingly, it must be concluded that the grant by the defendant to the advertising company of the right to erect the sign and the erection and maintenance of the sign did not constitute a constructive eviction.

Whether or not the defendant's course of conduct which resulted in the plaintiff's quitting possession was an eviction is quite another question. The defendant first wrongfully withheld the written lease from record and destroyed it. Later he repudiated the lease by advising the plaintiff that she had no such lease but only a year's lease and that after the end of the year she could occupy the property only on a month-to-month basis. He then represented to her that without having a written lease to show she could not prove nor enforce her ten year lease. These latter two statements cannot be held to be fraudulent because as regards the denial of the existence of a ten year lease the plaintiff was not deceived thereby and as regards the representation that the plaintiff could not prove her lease because no writing was in existence the defendant probably did not know that it was untrue. The net result of the defendant's course of conduct, however, was to convince the plaintiff that the defendant had succeeded in terminating her right to possession under the ten year lease.

This case is closely analagous to that line of cases in which a landlord has succeeded in evicting a tenant by taking out execution on a judgment in summary process or like proceedings where the court had no jurisdiction to render the judgment or where the judgment ran against another party and not against the tenant. In such cases it is commonly held that the tenant has a cause of action against the landlord either for trespass or for breach of the lease by eviction. *Anno.* L.R.A. 1918C, p.

323; *Smith vs. Eubanks & Hill,* 72 Ga. 280; *Sperry vs. Seidel,* 218 Pa. 16, 66 Atl. 853; *Morrison vs. Price,* 130 Ky. 139, 112 S.W. 1090.

Aside from such analagous cases, however, "it is now well established that *any* disturbance of the tenant's possession by the landlord, or someone acting under his authority, which renders the premises. unfit for occupancy for the purposes for which they were demised *or which deprives the tenant of the beneficial enjoyment of the premises,* causing him to abandon them, amounts to a constructive eviction, provided the tenant abandons the premises within a reasonable time." (Italics added.) 32 *Am. Jur. Landlord and Tenant* §246. At least under Connecticut law the acts of the landlord constituting such an eviction do not necessarily have to be done with force or do not have to be such as would constitute a trespass. *Gans vs. Olchin & Co., Inc.,* 109 Conn. 164.

In the present case, although the conduct of the defendant did not involve force or trespass, it was wrongful and it succeeded in convincing the plaintiff without any negligence on her part that she could no longer occupy the leased premises under the terms of her ten year lease. It accordingly resulted in her being deprived of the beneficial enjoyment of the premises and caused her to abandon them. It therefore constituted a constructive eviction. Her removal from the premises within a reasonable time, was simply an acceptance by her of the eviction. It was in no sense an acquiescence on her part in the termination of the lease nor a waiver of her rights because in the first place she did not intend it as such and in the second place even though she had she did it under a misapprehension of her legal rights. *Temple vs. New Britain,* 127 Conn. 170; *Bronson vs. Leibold,* 87 id. 293.

It is therefore concluded that the plaintiff has a cause of action against the defendant for the breach of the lease and wrongful eviction. Her measure of damages is the difference between the market value of the premises for the unexpired term of the lease and the reserved rent and as special damages her reasonable expenses of moving. *Gans vs. Olchin & Co., Inc., supra;* 32 *Am. Jur. Landlord and Tenant* §§265, 267. She has claimed loss of profits but the evidence does not justify a finding that she sustained any such loss.

The present value of the difference between the market value

of the premises for the unexpired term and the reserved rent is $900. The cost of moving was $499.77. Accordingly, the plaintiff's total damages amount to $1,399.77.

Judgment may enter on the first count of the complaint for and plaintiff to recover of the defendant $1,399.77 damages and her taxable costs.